IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RODERICK GILCREASE, | ) | CASE NO.  1:21-CV-01934-BYP |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE  BENITA Y. PEARSON |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| WARDEN BILL COOL, | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| Defendant. | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| | ) | |

This matter is before the magistrate judge pursuant to Local Rule 72.2.  Before the Court is the

Petition of Roderick Gilcrease  ("Gilcrease" or "Petitioner"), for a Writ of Habeas Corpus filed pursuant to

28 U.S.C. § 2254. (Doc. No. 1) Gilcrease is in the custody of the Ohio Department of Rehabilitation and

Correction pursuant to journal entry of sentence in the case *State v. Gilcrease,* Cuyahoga County Common

Pleas Court Case No. 2017 CR 620782-A.  For the following reasons, the undersigned recommends that the

Petition be **DENIED.**

### I.        Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state

court, factual determinations made by state courts are presumed correct unless rebutted by clear and

convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir.

2012); *Montgomery v. Bobby*, 654 F.3d 668, 701 (6th Cir. 2011).  The state appellate court summarized the

facts underlying Gilcrease's conviction as follows:

Sondi Robinson
[*P8] Sondi Robinson testified that in May 2017 she lived on Maud Avenue

1

in Cleveland, Ohio, with her son, Dominique Robinson ("Dominique"). Ms. Robinson testified that on the evening of May 14, 2017, someone shot at her house. She explained that she was getting a drink from her refrigerator when she heard glass popping and then she heard gunshots. She stated that she heard gunshots "across the front of my porch * * * coming through the window, through a dresser into the living room, [and] through the front door into the kitchen." Ms. Robinson observed damage caused by bullets to several parts of her home, including the front porch, window, living room dresser, and front door to her kitchen. Her son was not at home at the time of the shooting but she phoned him and told him what happened. Ms. Robinson phoned the police.

[*P9] Ms. Robinson also testified regarding how she learned that her son Dominique had been killed one month after the shooting into her home, in June 2017. She received a phone call from her son's friend on the evening of June 26, 2017, advising her that she should get to the hospital. Ms. Robinson ultimately learned that her son had died.

Officer McGreer
[*P10] Cleveland police officer Eric McGreer was on patrol with his partner when he received a call from dispatch concerning shots fired into a residence on Maud Avenue. Officer McGreer observed empty bullet casings in the front of the house and inside the house, as well as two bullet fragments inside the home. He ultimately collected a total of 12 casings, including six .40 caliber casings and six 9 mm casings, from the front yard of the house, the sidewalk, and the street. The casings did not appear to be weathered or damaged. The officer then submitted the casings as evidence.

Orvis Alexander
[*P11] Orvis Alexander testified that in May 2017 she lived on Simon Avenue in Cleveland, Ohio. She lived near Maud Avenue, where Ms. Robinson lived. Ms. Alexander testified that she knew Ms. Robinson from the neighborhood.

[*P12] Ms. Alexander testified that on the evening of May 14, 2017, she returned home very late and discovered that her house had been "shot up." She observed several bullet holes throughout the house, including the front porch banister, a window, and the side of the house. Some of the damage was observed from within the home, including bullet holes in the living room wall. Ms. Alexander also phoned the police.

Officer Gaviria
[*P13] Cleveland police officer Anglly Gaviria responded to the scene of shots fired into a habitation on Simon Avenue on May 14, 2017. She observed several bullet holes "going from the front of the house * * * all the way to the rear where the kitchen was [located]." Upon investigation, the officer recovered 31 bullet casings located on the street in front of the house, which included fourteen .40 caliber casings and seventeen 9 mm casings, and submitted them as evidence.

Latasha Minter
[*P14] Latasha Minter knew Dominique and his mother from the neighborhood. She testified that she used to stay a couple of houses away from his house on Maud Avenue.

2

Minter also knew Gilcrease "through [her] sister." She testified that she had "more than a friendship" with Gilcrease approximately ten years ago.

[*P15] Minter testified concerning the incident that occurred at the Sunoco gas station on June 2, 2017, into the following day. She testified that she was driving her sister's car that night and Gilcrease was with her. Avantay Martin, the defendant's cousin, drove separately. They all drove to the Sunoco so that Martin could purchase something from the convenience store. Both Martin and Minter parked their vehicles at the pumps. Martin asked Minter if she wanted anything from inside, Minter gave him some money for gum and pop, and Martin went inside the store. Shortly thereafter, Martin returned to Minter's car and handed Minter the items he purchased for her. Minter testified that when she bent down to set her pop and gum in the cup holder, she heard several gunshots and glass breaking, and she knew they were "getting shot." She stated that she did not know from which direction the shots were coming because she had her head down. Minter testified that she did not see anyone, including Gilcrease, fire a weapon, but after the gunshots ceased, she saw that Gilcrease was bleeding. The police and EMS arrived, and Gilcrease was transported to the hospital.

[*P16] Minter also testified concerning the events that transpired on June 26, 2017. Earlier in the evening, Minter, Minter's sister, Natanya Thompson, Gilcrease, and Gilcrease's cousins, Martin and Jameel, were hanging out at Martin's house, talking, smoking, and drinking. In the course of the evening, the group left Martin's house numerous times, at least once to purchase marijuana from a friend and once to purchase snacks for Martin's son.

[*P17] After Martin purchased snacks for his son, Thompson drove Martin and his son back to their house and dropped them off for the night. Minter, Thompson, and Gilcrease then left Martin's house for the last time that evening. Minter stated that Thompson was going to drive Gilcrease and Minter home. Gilcrease was seated in the backseat of Thompson's car, behind the driver, and Minter was seated in the middle seat next to Gilcrease.

[*P18] Minter testified that they were driving eastbound on St. Clair, toward Martin Luther King Boulevard ("MLK"), when they noticed another vehicle following closely behind them. They eventually proceeded to drive down MLK. When they stopped, the other car pulled up next to Thompson. Minter recognized the two people in the car as her brother's friends — Dominique, the front seat passenger, and Dominique's friend, Raheem Overby ("Raheem"), the driver. Once Minter recognized the two people in the car, she "sat back and kept playing on [her] phone" while her sister spoke with the people in the other car. Minter testified that "the next thing I remember [is] hearing gunshots" coming from her left where Gilcrease was seated. She remembered "three or four" shots She stated that just before the shooting, Gilcrease had asked her to hold his drink. Minter stated that although she had seen Gilcrease with a gun earlier in the day, she did not see him with a gun at that moment in the car. After the shooting, the two cars pulled off in different directions. Minter later learned that Dominique had been killed.

### Natanya Thompson

[*P19] Natanya Thompson, Minter's sister, had known the victim, Dominique, from the neighborhood since 2006 and was friends with him at the time of his death. Thompson testified that the victim's mother, Sondi Robinson, is related to one of her brothers. Thompson has known Gilcrease from the neighborhood since 2007.

[*P20] Thompson testified concerning the events of June 26, 2017. She stated that she, Minter, Gilcrease, and Avantay were talking and drinking at Avantay's house for a couple of hours. After driving to the gas station and back with Avantay, Thompson dropped Avantay off at his home and then proceeded to go home. Thompson stated that Gilcrease was sitting behind her in the vehicle and her sister, Minter, was seated next to Gilcrease.

[*P21] Thompson testified that she was driving eastbound on St. Clair, and when she turned right onto MLK, she noticed a car traveling closely behind her. She proceeded to take a right onto Wade Park Avenue when the car that was behind her pulled up next to her. She saw through her window, which was rolled down, that Dominique and Raheem were in the other car. She knew Raheem from the neighborhood, and they were friends. Thompson stated that she was initially nervous when she noticed a car following her, but when she saw Dominique and Raheem in the car, she was "okay." She testified that when she looked at the other car, Dominique was "cheesy smiling" and said, "hey." She said, "hey," and then began to "pull off" when she heard gunshots. Thompson stated that she did not know how many shots were fired, but there was more than one shot. Nor did she know from which direction the shots were coming because she ducked down in her seat. At some point, her sister told her to drive away.

[*P22] When she lifted her head back up, the other vehicle was gone. Thompson stated that she was concerned someone had been shot. Later in the evening, after the shooting, she phoned Dominique to see what happened and he did not answer his phone. She later learned that Dominique died as a result of the shooting that night. She eventually spoke with the police about the incident and told Dominique's mother what had transpired that evening and who was in the car with her.

[*P23] Thompson further testified that the gunshots were so loud her ears were ringing. When the police officers interviewed her, she indicated that some of the gunshots came from behind her. She recalled being "in shock" when Gilcrease apologized to her. Finally, Thompson testified that she discovered one bullet hole in her car from that night, and she concealed it with a sticker.

### Raheem Overby

[*P24] Raheem Overby testified that he was driving Dominique to the hospital on the evening of June 26, 2017, so that Dominique could visit his sick child. He testified that he pulled up to a red light at MLK and Wade Park when he heard gunshots: "I heard the first one, pow. The window bust and so I duck and take off. And after that I heard three more. Like I heard the trunk get hit. I heard about three more shots, like pow, pow and we was fleeing." Raheem testified that the gunshots came from their right side.

4

[*P25] As Raheem was driving away, Dominique grabbed his hand. At this point, Raheem guessed that Dominique had been shot. Raheem denied that he had been following another vehicle. Raheem further testified that although Dominique had a gun that evening because he "always" carries a gun, Raheem was "pretty sure" Dominique did not fire his weapon that evening. Raheem drove Dominique to the hospital.

Officer Morris
[*P26] Cleveland police officer Samuel Morris was working the night shift on June 26, 2017, when he was dispatched to the Cleveland Clinic for a male who had been shot Officer Morris testified that when he arrived on the scene, he observed a vehicle with gunshots to the passenger side of the vehicle as well as the trunk. He learned that a firearm was recovered from the vehicle prior to his arrival, and he secured the firearm in his patrol car. The officer observed that the firearm was jammed.

[*P27] Officer Morris learned that Raheem, who was on the scene when the officer arrived, was the driver of the vehicle containing the bullet holes. The officer interviewed Raheem and then transported him to the police station for questioning.

Detective Reese
[*P28] Cleveland police detective Aaron Reese responded to the gas station shooting on June 3, 2017. The detective learned that a male had been shot and had been transported to the hospital by the time the detective arrived on the scene. The male was identified as Gilcrease.

[*P29] Detective Reese observed the vehicle containing bullet holes on the scene and found the vehicle had "several rounds [that] were shot into." Additionally, the inside of the vehicle had significant damage from bullets. The detective observed several spent shell casings in the vehicle's interior, which caused him to believe that someone was shooting from inside the vehicle.

[*P30] Detective Reese obtained video surveillance from the gas station. The detective testified as to what the video depicted:

> I saw that Gilcrease was a passenger in a vehicle that was shot into and he ultimately was shot. And I watched him get out of the vehicle and shoot all over the place, many different directions. I watched him go into the gas station where he was bleeding significantly. He made a phone call. And then I watched as one of his friends arrived on [the] scene. Gilcrease went outside and handed his gun off to his friend, I assume the person he called, before he approached the police.

[*P31] Detective Reese testified that he also discovered multiple .40 caliber shell casings on the scene, near the entrance and the exit of the gas station, in addition to the casings discovered in the car's interior. He interviewed witnesses on the scene and ordered the vehicle towed. Finally, Detective Reese submitted the video and the shell casings into evidence. Ultimately, the evidence submitted from this scene included five .40 caliber

casings recovered from the ground and nine .40 caliber casings recovered from the vehicle's interior.

<u>Detective Clemens</u>
[*P32] Cleveland police detective Todd Clemens was working in the crime scene unit when he responded to the city's impound facility on June 3, 2017. Detective Clemens processed the vehicle that was involved in the shooting at the gas station that evening.

[*P33] He testified concerning the vehicle's damage caused by bullets, including defects in the windshield, the driver's side rear window, and the rear window. The detective recovered nine .40 caliber shell casings from the car's interior, which he submitted as evidence. He testified that eight of the nine casings were found in the passenger side of the vehicle. Finally, Detective Clemens testified that based upon the location of the casings, he believed that the weapon was fired from inside the vehicle.

<u>Detective Peoples</u>
[*P34] Cleveland police detective Mark Peoples was working in the crime scene unit when he responded to a felonious assault shooting at the Sunoco gas station on June 3, 2017. Detective Peoples photographed the scene and collected evidence. He recovered several spent .40 caliber shell casings.

[*P35] Detective Peoples also responded to the scene of a homicide at Wade Park and Ansel Road on June 26, 2017. The officers first responding to the scene had already secured the scene from pedestrian and vehicle traffic when he arrived. Detective Peoples proceeded to photograph the scene and collect evidence.

[*P36] The detective testified concerning spent shell casings that were discovered in the street. He testified that there were two distinct groups of casings recovered. The first group contained a cluster of nine .40 caliber casings, which the detective marked as numbers 1 through 9. This cluster of casings was discovered at the intersection of Wade Park and Ansel Road. The second cluster of casings consisted of five .40 caliber casings, numbered 10 through 14. This cluster was discovered "across the street from the original group of nine." He also stated this cluster was on "the other side of the street." The casings were submitted as evidence.

[*P37] Detective Peoples also photographed the vehicle that was left at the Cleveland Clinic and processed the evidence from the vehicle. He testified that the rear passenger side tire was flat, the passenger side rear window had been "smashed out," there were suspected bullet defects to the passenger side of the vehicle, and there was suspected blood found in the front passenger seat. Detective Peoples also testified that he recovered a spent 9 mm casing inside the vehicle. Additionally, the detective stated that another officer had recovered a firearm from inside the vehicle and that firearm was given to the detective to photograph. Detective Peoples testified that this firearm contained 15 live rounds that had not been fired, one of which was located inside the chamber.

Detective Shapiro

[*P38] Cleveland police homicide detective David Shapiro also responded to the scene of the homicide at Wade Park and Ansel Road on June 26, 2017, where the crime scene unit had already begun processing the scene. Detective Shapiro testified that he observed two separate groups of shell casings, all of which were the same caliber.

[*P39] The detective further testified that his investigation continued to the Cleveland Clinic where he observed the vehicle that had been at the shooting on Wade Park and Ansel Road. He testified that the vehicle had heavy rear end damage, "obvious defects in the passenger side," evidence of blood, and broken windows.

James Kooser

[*P40] James Kooser, a firearms and toolmarks examiner with the Cuyahoga County Regional Forensic Science Laboratory, testified as a ballistics expert. Kooser testified that he analyzed all the evidence submitted to him on this case, which included the spent casings recovered from the incidents at the two residences, the gas station, and the intersection of Wade Park and Ansel Road. He further testified that all of the .40 caliber casings he received for examination in this case were fired by the same unknown Smith & Wesson .40 caliber pistol, including the casings recovered near the homes on Simon Avenue and Maud Avenue on May 14; from the ground and from the vehicle's interior at the Sunoco gas station on June 3; and from two different locations in the street at the Wade Park/Ansel Road intersection on June 26. Kooser explained that the firearm is "unknown" because no firearm was recovered from the scenes or submitted for comparison.

Roderick Gilcrease

[*P41] Gilcrease testified on his own behalf. He admitted that he possessed a .40 caliber firearm on June 3 and June 26 but denied having this firearm on May 14 and denied firing his gun on May 14. Gilcrease also admitted to giving his firearm to a friend at the gas station following the shooting. Gilcrease testified that this friend later returned the same firearm.

*State v. Gilcrease,* No. 108148, 2020 Ohio App. LEXIS 451 at *5-20 (Ohio Ct. App. Feb.13, 2020). (Doc. No. 5-1, Ex. 9, ¶¶. 8-41).

## II.  Procedural History

### A.  Trial Court Proceedings

On October 10, 2017, the Cuyahoga County Court of Common Pleas Grand Jury charged Gilcrease in a 20-count indictment, arising from four separate incidents on three different dates

7

(May 14, 2017; June 2, 2017; June 26, 2017). (Doc. No. 5-1, Ex. 1) The charges were as

follows:

**May 14, 2017: Counts 1 through 4 involve two house shootings ("house shootings")**
- Counts 1 & 3: Improperly Discharging Into Habitation, in violation of R.C. 2923.161(A)(1) (victim, Count 1: Orvis Alexander; victim, Count 3: Sondi Robinson); and
- Counts 2 & 4: Discharge of a Firearm On or Near Prohibited Premises, in violation of R.C. 2923.162(A)(3).
- Counts 1, 2, and 4 include one, three, and five-year firearm specifications.

**June 2, 2017:  Counts 5 through 13 involve a shooting that occurred at a gas station ("gas station shooting")**
- Counts 5-10: Felonious Assault, in violation of R.C. 2903.11(A)(2);
- Count 11: Discharge of a Firearm On or Near Prohibited Premises, in violation of R.C. 2923.162(A)(3);
- Count 12: Tampering With Evidence, in violation of R.C. 2921.12(A)(1); and
- Count 13: Carrying a Concealed Weapon, in violation of R.C. 2923.12(A)(2).
- Counts 5-11 include one, three, and five-year firearm specifications.

**June 26, 2017: Counts 14 through 20 involve a shooting on a public roadway near Wade Park ("Wade Park shooting")**
- Count 14: Aggravated Murder, in violation of R.C. 2903.01(A);
- Count 15: Murder, in violation of R.C. 2903.02(B);
- Count 16-18: Felonious Assault, in violation of R.C. 2903.11(A)(1),;
- Count 19: Discharge of a Firearm On or Near Prohibited Premises, in violation of R.C. 2923.162(A)(3);
- Count 20: Carrying a Concealed Weapon, in violation of R.C. 2923.12(A)(2); and
- Counts 14 through 19 include one, three, and five-year firearm specifications.

(*Id.*, Exs. 1 & 9) On October 13, 2017, Gilcrease entered pleas of not guilty to all charges. (*Id.,*

Ex. 2)

The case proceeded to a bench trial on October 22, 2018.  (Doc. No. 5-2 at 31) On

November 1, 2018, the trial court returned its verdict, finding Gilcrease guilty of  the following:

- Counts 1 & 3, Improperly Discharging Into Habitation;
- Counts 2, 4, 19, Discharge of a Firearm On or Near Prohibited Premises;
- Count 12, Tampering With Evidence; and,
- Counts 13 & 20, Carrying a Concealed Weapon.
- Counts 1, 2, 4, and 19 included firearm specifications.

(Doc. No. 5-1, Ex. 4) Gilcrease was found not guilty of Murder (Count 15) and three Felonious Assault charges (16, 17, 18). The remaining counts (5, 6, 7, 8, 9, 10, 11, 14) were dismissed via Ohio Crim. R. 29. On January 15, 2019, the state trial court held a sentencing hearing and sentenced Gilcrease to an aggregate sentence of twenty-five years' incarceration. (*Id.*, Ex. 5)

**B.    Direct Appeal**

Gilcrease, through counsel, filed a timely notice of appeal to the Eighth District Court of Appeals. (Doc. No. 5-1 at Ex. 6) In his May 24, 2019, appellate brief, he raised the following assignments of error:

I.    THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A MISTRIAL.

II.   THE TRIAL COURT ERRED BY RENDERING GUILTY VERDICTS ON COUNTS ONE, TWO, THREE, AND FOUR AS THEY ARE NOT SUSTAINED BY SUFFICIENT EVIDENCE.

III.  THE TRIAL COURT ERRED BY RENDERING GUILTY VERDICTS ON COUNTS ONE, TWO, THREE, FOUR, AND NINETEEN AS THEY ARE AGAINST THE WEIGHT OF THE EVIDENCE.

IV.   THE TRIAL COURT ERRED BY IMPOSING CONSECUTIVE SENTENCES WHERE THEY ARE NOT SUPPORTED BY THE RECORD.

(*Id.*, Ex. 7) The State filed a brief in response. (*Id.,* Ex. 8)

On February 13, 2020, the state appellate court affirmed Gilcrease's convictions, but remanded the case for the limited purpose of imposing sentence on count 13, carrying a concealed weapon. (*Id.,* Ex. 9)

On June 16, 2020, Gilcrease, proceeding *pro se*, filed a Notice of Appeal and Motion for Leave to File a Delayed Appeal with the Supreme Court of Ohio. (*Id.,* Exs. 10, 11) The Ohio Supreme Court granted Gilcrease's motion for delayed appeal. (*Id.*, Ex. 12) In his Memorandum in Support of Jurisdiction, Gilcrease raised the following Propositions of Law:

    I.        Can invoking our Fifth Amendment right be a deciding factor in charging an individual with a crime.

    II.      Whether a conviction based on legally insufficient evidence constitutes a denial of due process.

    III.    That a [*sic*] individual can not [*sic*] act in self-defense for fear of incurring a charge of criminal damaging or another related charge.

(*Id*.)  The State did not file a response.

On October 13, 2020, the Supreme Court of Ohio declined to accept jurisdiction of the appeal pursuant to S.Ct. Prac.R. 7.08(B)(4).  (*Id.*, Ex. 14)

## C.    Federal Habeas Petition

On October 13, 2021, through counsel, Gilcrease filed a Petition for Writ of Habeas Corpus in this Court and asserted the following grounds for relief:

**GROUND ONE**:  Due Process violation as a result of a violation of Petitioner's Fifth Amendment rights.

**GROUND TWO**: The conviction was based on legally insufficient evidence which resulted in a violation of Petitioner's right to due process.

(Doc. No. 1) On April 6, 2022, Warden Bill Cool ("Respondent") filed his Return of Writ. (Doc. No. 5.) Gilcrease filed a Traverse on June 6, 2022. (Doc. No. 7)

## III.    Review on the Merits

## A.    Standard of Review

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The relevant provisions of AEDPA state:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996).

Clearly established federal law is to be determined by the holdings (as opposed to the dicta) of the United States Supreme Court.  *See Parker v. Matthews*, 567 U.S. 37, 132 S.Ct. 2148, 183 L.Ed.2d 32 (2012); *Renico v Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1865-1866 (2010); *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Shimel v.Warren,* 838 F.3d 685, 695 (6th Cir. 2016); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir.2005).  Indeed, the Supreme Court has indicated that circuit precedent does not constitute "clearly established Federal law, as determined by the Supreme Court."  *Parker*, 567 U.S. at 48-49; *Howes v. Walker*, 567 U.S. 901, 132 S.Ct. 2741, 183 L.Ed.2d 612 (2012).  *See also Lopez v.Smith*, 574 U.S. 1, 7, 135 S.Ct. 1, 4, 190 L.Ed.2d 1 (2014) (per curiam) ("Circuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced.' " (quoting *Marshall v. Rodgers*, 569 U.S. 58, 133 S.Ct. 1446, 1450, 185 L.Ed.2d 540 (2013)).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 413.  By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id. See also Shimel*, 838 F.3d at 695.  However, a federal district court may not find a

11

state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Williams v. Taylor,* 529 U.S. at 411.  Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law.  *Id.* at 410-12.  "This standard generally requires that federal courts defer to state-court decisions." *Strickland v. Pitcher*, 162 Fed. Appx. 511, 516 (6th Cir. 2006) (citing *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

In *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), the Supreme Court held that as long as "fairminded jurists could disagree on the correctness of the state court's decision," relief is precluded under the AEDPA.  *Id.* at 786 (internal quotation marks omitted).  The Court admonished that a reviewing court may not "treat[ ] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. at 785.  The Court noted that Section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Id*. (internal quotation marks omitted).  Therefore, a petitioner "must show that the state court's ruling ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786–87.  This is a very high standard, which the Supreme Court readily acknowledged.  *See id.* at 786 ("If this standard is difficult to meet, that is because it is meant to be.")

**B.** **Gilcrease's Petition**

    **1.** **Ground One**

    In his first ground for relief, Gilcrease argues that the state violated his Fifth Amendment right against self-incrimination because the prosecutor elicited testimony from an investigator that Gilcrease exercised his right to remain silent during police questioning. (Doc. No. 1-2 at 4-6) Gilcrease maintains that the state court improperly denied his request for mistrial on this basis. (*Id.*) The Warden argues that any Fifth Amendment error was harmless. (Doc. No. 5 at 19) The Warden also asserts that Gilcrease fails to show that the appellate court's decision upholding the trial court's denial of a mistrial was contrary to or involved an unreasonable application of clearly established Supreme Court precedent. (*Id.*)

    <u>Legal Standard</u>

    Gilcrease argues that the state court's determination regarding Detective Reese's testimony was contrary to or an unreasonable application of the following U.S. Supreme Court cases: *Miranda v. Arizona,* 384 U.S. 436 (1966) and *Doyle v. Ohio* (1976)

    In *Miranda,* the U.S. Supreme Court held "[I]t is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under a police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation." *Miranda,* 384 U.S. at 468 n.37. The Fifth Amendment of the U.S. Constitution guarantees "No person . . . shall be compelled in any criminal case to be a witness against himself."

    In *Doyle*, the petitioners, who were arrested for selling marijuana, chose to remain silent after receiving their *Miranda* warnings. At trial, both took the stand and claimed they were "framed" by a government informant. 426 U.S., at 613, 96 S.Ct. 2240. In order to impeach the

13

petitioners, the prosecutor repeatedly asked each why they had not provided this information to police at the time of their arrest. The Supreme Court held that, "[t]he use for impeachment purposes of petitioners' silence, at the time of arrest and after they received *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Doyle*, 426 U.S. at 619.

In a later case, the Supreme Court determined that a *Doyle* violation is subject to "harmless-error" analysis on collateral review. *Brecht v. Abrahamson*, 507 U.S. 619, 629, 113 S. Ct. 1710, 1717, 123 L. Ed. 2d 353 (1993) The Court explained that an error is harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 638 (quoting *Kotteakos v. United States*, 328 U.S. 750, 775, 66 S. Ct. 1239, 1252, 90 L. Ed. 1557 (1946)). This means that a petitioner is "not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.' " *Brecht*, 507 U.S. at 638.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) was passed shortly after *Brecht*. The Supreme Court has held that habeas relief must not be granted unless a petitioner can satisfy both the *Brecht* "substantial and injurious effect or influence" test and the AEDPA "contrary to or unreasonable application" test. *Brown v. Davenport*, 212 L. Ed. 2d 463, 142 S. Ct. 1510, 1526 (2022); *see also Casanova v. Campbell,* No. 22-1394, 2022 WL 16635440, at *5 (6th Cir. Oct. 12, 2022) (same).

### **Analysis**

At trial, Detective Aaron Reese testified that he interviewed Gilcrease in the hospital following the "gas station shooting." The Court of Appeals made the following factual findings regarding Detective Reese's testimony:

> **[\*P45]** Here, Detective Reese testified on direct examination regarding his investigation into the gas station shooting on June 3. He stated that he watched the surveillance video of the incident, which showed Gilcrease being shot while he was a passenger in a vehicle. According to the detective, the

video also showed Gilcrease exit the vehicle, "shoot all over the place, many different locations," enter the gas station where he placed a phone call, and then exit the gas station and hand off his gun to a friend before he approached the police. Detective Reese further testified that by the time he had arrived on the scene, Gilcrease had been transported to the hospital for treatment of his gunshot wound. He later questioned Gilcrease in the hospital concerning the incident. The detective stated that Gilcrease was an uncooperative victim and therefore the detective was not able to obtain any information from Gilcrease to aid in the detective's investigation.

[*P46] On redirect examination, the prosecutor asked Detective Reese if he would view the surveillance video, speak with witnesses, and ascertain the location of the casings in order to determine the intention of a shooter, to which the detective replied in the affirmative. The prosecutor then asked Detective Reese if he learned anything on June 5 that would have affected his analysis of the shooting, to which the detective replied, "Yes." Thereafter, the following discourse, which forms the basis of the defense's motion, occurred:

Prosecutor: What was that?
Witness: The video.
Prosecutor: The video. Did you ever — how about anything, any of Roderick Gilcrease's own words, did anything that he say come into your analysis, as well?
Witness: Yes.
Prosecutor: What was that?
Prosecutor: What was that? Witness: When he plead the Fifth when I asked him if he had —
Prosecutor: Strike that.
Court: I'm not going to strike it. Sorry. I'm not going to strike it.
Prosecutor: I'll ask a more precise question.

[*P47] At this point, the prosecutor asked the detective, referring to the detective's supplemental report, whether the detective listened to "one of [Gilcrease's] call[s] on June 5th." Detective Reese replied, "I misunderstood you * * * I listened to his jail calls, several jail calls * * * and I listened to [Gilcrease] explain what he was going to do when he got out of jail * * * that he was going to get the guys who did this to him * * * that he was going to 'f*** one of them N's up when [he] get[s] out.'"

[*P48] Following this testimony, the defense moved for a mistrial, arguing that the prosecutor purposefully elicited improper testimony from the detective. In response, the prosecutor stated that he was not attempting to elicit improper testimony from the detective; rather, he was attempting to elicit the detective's testimony concerning his review of a jail call between Gilcrease and another individual on June 5. The prosecutor explained that

the conversation between Detective Reese and Gilcrease occurred either in the evening of June 2 or the early morning hours of June 3, and the question he posed to the detective specifically referenced information the detective gleaned on June 5, which was the date Detective Reese reviewed the jail call.

[*P49] After hearing from both the defense and the prosecution, the court denied the motion for a mistrial. In so doing, the court stated that it is never pleased to hear "that somebody pleading the Fifth is going to change their analysis in the case" and acknowledged that this type of statement "may ha[ve] an effect" on laypeople, but "it doesn't have an effect on me." The court explained:

> I understand what your client's constitutional rights are. And I understand that nobody can use that against him. * * * Let me be honest here. I don't really care about [the detective's] analysis of the case. * * * Nor do you want me to care about the analysis of case, correct? I'm the fact-finder.

> We're not dealing with a jury. We're not dealing with 12 laypeople. This officer is entitled to whatever opinion he wants about the investigation. And in the end it's my decision what the facts are, not his. And I can independently operate.

> And I'm fully aware and very protective of everybody's constitutional rights, regardless of where they sit in this room. So I don't think it [rises] to a mistrial * * *.

*Gilcrease,* 2020 Ohio App. LEXIS 451 at *21-24 (Doc. No. 5-1, Ex. 9, ¶¶ 45-49; Tr. 587-588, 590-594, 596-597).

In its decision upholding the trial court's denial of Gilcrease's motion for mistrial, the appellate court provided the following analysis:

[*P50] The Fifth Amendment to the Constitution of the United States provides that no person "shall be compelled in any criminal case to be a witness against himself." This amendment is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

[*P51] Evidence introduced by the state regarding the defendant's exercise of his right to remain silent violates the Due Process Clause of both the state and federal constitutions. *State v. McMiller*, 8th Dist.

16

Cuyahoga No. 103962, 2016-Ohio-5844, ¶ 43, citing *State v. Leach*, 102 Ohio St. 3d 135, 2004-Ohio-2147, 807 N.E.2d 335, ¶ 18. "This rule enforces one of the underlying policies of the Fifth Amendment, which is to avoid having the jury assume that a defendant's silence equates with guilt." *McMiller*, citing *Leach* at ¶ 30, citing *Murphy v. Waterfront Comm. of N.Y. Harbor*, 378 U.S. 52, 55, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).

**[\*P52]** In a bench trial, the court is presumed to know and follow the law unless the record affirmatively demonstrates to the contrary. *State v. Kilbane*, 8th Dist. Cuyahoga No. 106753, 2019-Ohio-863, ¶ 15; *State v. Willis*, 8th Dist. Cuyahoga No. 90956, 2008-Ohio-6156, ¶ 15 ("[I]n a bench trial, the court is presumed to have considered only the relevant, material, and competent evidence."). The United States Supreme Court has stated that

> [i]n bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions. It is equally routine for them to instruct juries that no adverse inference may be drawn from a defendant's failure to testify; surely we must presume that they follow their own instructions when they are acting as factfinders.

*Harris v. Rivera*, 454 U.S. 339, 346, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981); *State v. Shropshire*, 8th Dist. Cuyahoga No. 103808, 2016-Ohio-7224, ¶ 38.

**[\*P53]** Here, the detective's improper reference to Gilcrease's assertion of his Fifth Amendment right is arguably concerning. Because the matter was tried to the court, however, we can presume that the detective's statement did not infect the court's decision-making. And the court's explanation in denying the motion for mistrial supports this presumption. There is nothing in the record that demonstrates the court declined to ignore the improper statement.

**[\*P54]** Furthermore, Gilcrease has not demonstrated that the detective's statement deprived him of a fair trial. Indeed, the record demonstrates that the court granted Gilcrease's Crim.R. 29 motion for dismissal of the felonious assault charges in Counts 5 through 10, which stem from the gas station shooting about which the detective testified, and the aggravated murder charge in Count 14, which stems from the shooting on June 26. The court also found Gilcrease not guilty on Counts 15 through 18, which stem from the June 26 shooting.

**[\*P55]** We therefore find that the trial court did not abuse its discretion in denying Gilcrease's motion for mistrial because "the ends of justice" did not "so require." *Franklin*, 62 Ohio St.3d at 127, 580 N.E.2d 1, citing *Somerville*, 410 U.S. at 462-463, 93 S.Ct. 1066, 35 L.Ed.2d 425. Gilcrease's first assignment of error is overruled.

*Gilcrease,* 2020 Ohio App. LEXIS 451 at *24-26. (Doc. No. 5-1, Ex. 9, ¶¶ 50-55). The appellate court's determination is the last reasoned state-court decision.

In order to obtain habeas relief, Gilcrease must satisfy both the *Brecht* "substantial and injurious effect or influence" test and the AEDPA "contrary to or unreasonable application" test. *Brown v. Davenport*, 212 L. Ed. 2d 463, 142 S. Ct. 1510, 1526 (2022)  However, he has not demonstrated that he can satisfy either test.

The Supreme Court's decision in *Greer* is instructive. *Greer v. Miller*, 483 U.S. 756, 764, 107 S. Ct. 3102, 3108, 97 L. Ed. 2d 618 (1987). In *Greer*, like this case, defendant's lawyer moved for a mistrial based on a *Doyle* violation. However, the Supreme Court held that no *Doyle* violation occurred because the trial court sustained an objection to the question about the defendant's postarrest silence. *Id.* at 764-65 (" Miller's postarrest silence was not submitted to the jury as evidence from which it was allowed to draw any permissible inference, and thus no *Doyle* violation occurred in this case." ) The Court further stated that, "[i]t is significant that in each of the cases in which this Court has applied *Doyle,* the trial court has permitted specific inquiry or argument respecting the defendant's post-*Miranda* silence." *Id.* at 764 (collecting cases). In accordance with *Greer*, the Sixth Circuit has found that a curative instruction renders a *Doyle* violation harmless. *Shaieb v. Burghuis*, 499 F. App'x 486, 495–96 (6th Cir. 2012) ("curative instruction remedied any possible prejudice and there was no reason to believe that the jury was unable to follow this instruction.")

Though similar, Gilcrease's *Doyle* argument is weaker than the argument rejected in *Greer.* This is because Greer had a jury trial, whereas Gilcrease had a bench trial. There is a presumption that a trial judge does not draw impermissible influences on constitutional violative statements, which Gilcrease has not overcome. In fact, the trial judge in Gilcrease's case

18

expressly stated he would not draw an impermissible inference from Detective Reese's

statements on Gilcrease's silence:

> [*P49] After hearing from both the defense and the prosecution, the court
> denied the motion for a mistrial. In so doing, the court stated that it is never
> pleased to hear "that somebody pleading the Fifth is going to change their
> analysis in the case" and acknowledged that this type of statement "may
> ha[ve] an effect" on laypeople, but "it doesn't have an effect on me." The court
> explained:
>
>> I understand what your client's constitutional rights are. And I
>> understand that nobody can use that against him. * * * Let me be
>> honest here. I don't really care about [the detective's] analysis of the
>> case. * * * Nor do you want me to care about the analysis of case,
>> correct? I'm the fact-finder.
>> We're not dealing with a jury. We're not dealing with 12 laypeople. This
>> officer is entitled to whatever opinion he wants about the investigation.
>> And in the end it's my decision what the facts are, not his. And I can
>> independently operate.
>> And I'm fully aware and very protective of everybody's constitutional
>> rights, regardless of where they sit in this room. So I don't think it [rises]
>> to a mistrial * * *.

*Gilcrease*, 2020 Ohio App. LEXIS 451 at *21-24 (Doc. No. 5-1, Ex. 9, ¶¶ 45-49; Tr. 587-588,

590-594, 596-597).

The Supreme Court instructs that judges in bench trials, "routinely hear inadmissible

evidence that they are presumed to ignore when making decisions." *Harris v. Rivera,* 454 U.S.

339, 346, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981) (per curiam); *see also Moreland v. Bradshaw,*

699 F.3d 908, 929 (6th Cir. 2012) (finding that judges are "presumed to recognize constitutional

violations and disregard any evidence that was unconstitutionally obtained."); *Smith v. Mitchell,*

348 F.3d 177, 206 (6th Cir.2003) (because argument was made to a three-judge panel any

inflammatory effect was "de minimis"); *Dowdell v. Wilson*, No. 06-404, 2007 WL 1299269, at

*9 (N.D. Ohio May 2, 2007) ( "[B]ecause this was a bench trial, there is no need to consider

even the remote possibility that an unsophisticated juror might draw impermissible inferences of

19

guilt from this remark within this context.") The trial judge is presumed to ignore improper evidence and, in this case, she expressly stated that she would do so. Gilcrease has not pointed to any evidence that would suggest that the court declined to ignore the improper statement. Accordingly, Gilcrease cannot show that the exchange had a "substantial and injurious effect or influence" on the verdict. The state appellate court found that the exchange did not violate Gilcrease's Fifth Amendment rights for this reason (i.e., because the trial judge is presumed to know and follow the law by considering only relevant, material, and competitive evidence, unless the record affirmatively demonstrates to the contrary). This determination was not contrary to or an unreasonable application of federal law.

In support of his *Doyle* error argument, Gilcrease cites *Griffin v. California*, 380 U.S. 609, 611, 85 S. Ct. 1229, 1231, 14 L. Ed. 2d 106 (1965). However, *Griffin* is not factually analogous. In *Griffin*, both the prosecutor and the trial court asked the jury to draw an inference from the defendant's failure to testify. As the Supreme Court noted, the prosecutor "made much of the failure of petitioner to testify," making direct references on the issue multiple times to the jury stating things like "he has not seen fit to take the stand and deny or explain" and "Essie Mae is dead, she can't tell you her side of the story. The defendant won't." *Id.* at 610-11. The trial court in *Griffin* also improperly instructed the jury that they were allowed to draw an unfavorable inference on defendant's failure to testify. *Id.* at 610, 614. No such similar facts exist in this case. The prosecutor did not "make much" of Gilcrease's failure to testify. Gilcrease admits in his Traverse that it was Detective Reese, not the prosecutor, who commented on Gilcrease's silence. (Doc. No. 7 at 10) ("Detective Reese specifically commented, twice, on Mr. Gilcrease's right to remain silent.") There is no evidence that the prosecutor attempted to exploit Detective Reese's comments. On redirect, the prosecutor even tried to strike Detective Reese's

comment.[1] (Doc. No. 5-4 at 88-89, Tr. 587-88) Also, unlike in *Griffin*, the trial court here did not

"solemnize[] the silence of the accused into evidence against him." The judge presiding over

Gilcrease's bench trial stated he would disregard the statements and is presumed to have done so.

*Griffin's* holding also does not support Gilcrease's first ground. The *Griffin* court held that the

Fifth Amendment forbids "either comment by the prosecution on the accused's silence or

instructions by the court that such silence is evidence of guilt." *Id.* at 615. And again here, the

prosecutor did not "comment" on Gilcrease's silence, it was Detective Reese. As neither the

facts nor holding of *Griffin* apply to this case, *Griffin* does not support Gilcrease's argument.[2]

The Court also notes that Detective Reese's testimony regarding Gilcrease's silence was

in relation to the detective's contact with Gilcrease following the "gas station shooting" and the

evidence for Gilcrease's convictions on the counts related to the "gas station shooting" is

overwhelming. Gilcrease was indicted on six counts in relation to the "gas station shooting"—

four counts of felonious assault, one count of tampering with evidence, and one count of

carrying a concealed weapon. The Court found Gilcrease guilty on only two of the counts:

tampering with evidence[3] (Count 12) and carrying a concealed weapon[4] (Count 13). The

---

[1] When Detective Reese testified that Gilcrease "plead the Fifth when I asked him if he had—" the prosecutor interrupted the witness midsentence and stated, "Strike that."
[2] For similar reasons *Girts v. Yanai*, 501 F.3d 743 (6th Cir. 2007) is also not applicable. In *Girts*, the prosecutor exploited the defendant's silence in his closing statement. Thus, like in *Griffin*, the prosecutor made specific comments about the defendant's choice to remain silent and tried to use it against him. By comparison, the prosecutor in Gilcrease's case did not offer commentary on, or try to exploit, Gilcrease's silence.
[3] Tampering with Evidence, R.C. 2921.12(A)(1) states that:
      (A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:
      (1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation;
[4] Carrying concealed weapons, R.C. 2923.12(A)(2) states that:
      (A) No person shall knowingly carry or have, concealed on the person's person or concealed ready at hand, any of the following:
      (2) A handgun other than a dangerous ordnance;

evidence supporting these convictions included Detective Reese's testimony regarding what he saw on the surveillance video and Gilcrease's own in-court testimony.

When asked what he did with the gun after he used it to protect himself, Gilcrease stated that he gave the gun to someone named Teddy he knew from the neighborhood. (Doc. No. 5-5 at 120, lines 3-13) When asked if Teddy stated to give him the gun because police were coming, Gilcrease answered "Yes." (*Id.*, lines 19-23) Detective Reese also testified regarding the events at the gas station. He testified that he watched the surveillance video of the incident and that the video showed:

> Gilcrease being shot while he was a passenger in a vehicle…[and] also showed Gilcrease exit the vehicle, "shoot all over the place, many different locations," enter the gas station where he placed a phone call, and then exit the gas station and hand off his gun to a friend before he approached the police.

(Doc. No. 5-1, Ex. 9 ¶ 45)  Thus, undisputed evidence at trial, including Gilcrease's own testimony, showed that Gilcrease used a gun to defend himself after being shot at the gas station and gave that gun to a friend before police arrived. Due to the strength of the evidence supporting his "gas station shooting" convictions (i.e. carrying a concealed weapon and tampering with evidence), and the Court's dismissal of some of the counts, Gilcrease cannot demonstrate that Detective Reese's comments had "a substantial and injurious effect or influence in determining the [court's] verdict." Thus, Gilcrease has not established "actual prejudice" as a result of the alleged error (*Brecht,* 507 U.S. at 637) and has not shown that the appellate court's decision is contrary to or an unreasonable application of federal law.

For all the above reasons, Gilcrease fails to demonstrate an entitlement to habeas relief on Ground One.

### 2.    Ground Two

In his second ground for relief, Gilcrease argues that his Fourteenth Amendment Due Process right was violated because his convictions on Counts One through Four were not supported by sufficient evidence. (Doc. No. 7 at 11-14) Counts One through Four pertain to the "house shooting" incidents on May 14, 2017 and include the following:

- Count 1 — improperly discharging into habitation in violation of R.C. 2923.161(A)(1) (victim, Orvis Alexander);
- Count 2 — discharge of firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3);
- Count 3 — improperly discharging into habitation in violation of R.C. 2923.161(A)(1) (victim, Sondi Robinson); and
- Count 4 — discharge of firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3).
- Counts 1, 2, and 4 include one-and three-year firearm specifications.

*Gilcrease*, 2020 Ohio App. LEXIS 451 at *2-3 (Doc. No. 5-1, Ex. 9, ¶¶ 12-14 and Ex. 2).

### Legal Standard

Gilcrease grounds his due process argument in the Supreme Court's decision in *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). (Doc. No. 1-2 at 6-7; Doc. No. 7 at 13) In *Jackson v.* Virginia, the Court held that a petitioner is entitled to habeas corpus relief under §2254 if "it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S. Ct. 2781, 2791–92, 61 L. Ed. 2d 560 (1979) However, during habeas review, a state court's determination regarding a sufficiency of evidence claim is entitled to a "double layer" of deference. *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008).

The first layer of deference goes to the factfinder. *Id.* As explained in *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009), deference is due to the fact finder's determination of guilt because the standard announced in *Jackson* is whether, "viewing the trial testimony and exhibits

23

in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Brown v. Konteh*, 567 F.3d at 205. This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the basic facts to ultimate facts." *Jackson*, 443 at 319. The second layer of deference goes to the state appellate court. Even if the federal habeas court believes that a rational trier of fact could not have found guilt beyond a reasonable doubt, a federal habeas court "must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *Brown*, 567 F.3d at 205*; see also White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009). A claim that the evidence was constitutionally insufficient to support a conviction is a mixed question of law and fact. *Starr v. Mitchell*, 234 F.3d 1270, at *3 (6th Cir. 2000) (unpublished). Thus, "a writ of habeas corpus may be issued for evidence insufficiency only if the state court adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' 28 U.S.C. §2254(d)(1), or was based on 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,' 28 U.S.C. §2254(d)(2)." *Id.*

**Analysis**

The appellate court reviewed Gilcrease's sufficiency of the evidence claim related to Counts Ones through Four and found as follows:

> [*P56] In his second assignment of error, Gilcrease contends that the state failed to provide sufficient evidence to support his conviction of improperly discharging into a habitation (Counts 1 and 3) and discharging a firearm on or near prohibited premises (Counts 2 and 4) on May 14, 2017. Gilcrease argues that the evidence was insufficient to show that he was the person who committed the crimes, and even if the evidence established his identity as the shooter, the state presented no evidence of Gilcrease's mental state at the time of the shooting (as it pertains to Counts 1 and 3).

24

[*P57] When assessing a challenge of sufficiency of the evidence, a reviewing court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Jenks, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id. A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." State v. Thompkins, 78 Ohio St. 3d 380, 390, 1997-Ohio-52, 678 N.E.2d 541 (1997).

[*P58] The elements of an offense may be proven by direct evidence, circumstantial evidence, or both. See State v. Durr, 58 Ohio St.3d 86, 568 N.E.2d 674 (1991). Direct evidence exists when "a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered to establish." State v. Cassano, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13. Circumstantial evidence, on the other hand, is evidence that requires "the drawing of inferences that are reasonably permitted by the evidence." Id. See also State v. Hartman, 8th Dist. Cuyahoga No. 90284, 2008-Ohio-3683, ¶ 37 ("[c]ircumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind"). Circumstantial and direct evidence are of equal evidentiary value. State v. Santiago, 8th Dist. Cuyahoga No. 95333, 2011-Ohio-1691, ¶ 12. And in some cases, circumstantial evidence may be "'more certain, satisfying and persuasive than direct evidence.'" State v. Lott, 51 Ohio St.3d 160, 167, 555 N.E.2d 293 (1990), quoting Michalic v. Cleveland Tankers, Inc., 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960).

[*P59] R.C. 2923.161(A)(1) provides that "[n]o person, without privilege to do so, shall knowingly * * * [d]ischarge a firearm into an occupied structure that is a permanent or temporary habitation of any individual." R.C. 2923.162(A)(3) provides that "[n]o person shall * * * [d]ischarge a firearm upon or over a public road or highway."

[*P60] R.C. 2901.22(B) provides that a person acts "knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." This court has repeatedly held that "'shooting a gun in a place where there is risk of injury to one or more persons supports the

inference that the offender acted knowingly.'" State v. Robinson, 8th Dist. Cuyahoga No. 99290, 2013-Ohio-4375, ¶ 38, quoting State v. Hunt, 8th Dist. Cuyahoga No. 93080, 2010-Ohio-1419, ¶ 19, citing State v. Brooks, 44 Ohio St.3d 185, 192, 542 N.E.2d 636 (1989); see also State v. Ivory, 8th Dist. Cuyahoga No. 83170, 2004-Ohio-2968, ¶ 6; State v. Jordan, 8th Dist. Cuyahoga No. 73364, 1998 Ohio App. LEXIS 5571 (Nov. 25, 1998).

[*P61] Here, the evidence shows that Gilcrease was in possession of a .40 caliber firearm on June 26, 2017, at the intersection of Wade Park and Ansel Road, and he discharged 14 rounds from this firearm that ultimately resulted in the death of Dominique Robinson. Additionally, officers recovered numerous .40 caliber casings outside of Ms. Robinson's home on Maud Avenue, where Dominique also lived, and Ms. Alexander's nearby home on Simon Avenue. Officers also recovered multiple .40 caliber casings from the gas station shooting on June 3, 2017. Several of these casings were located in the vehicle in which Gilcrease was a passenger. The video surveillance of the gas station shooting shows Gilcrease firing a .40 caliber firearm and then handing the weapon to another individual before approaching police officers on the scene. The ballistics expert testified that all of the .40 caliber casings that were recovered from the shooting at the homes on Maud Avenue and Simon Avenue, the shooting at the gas station, and the homicide of Dominique Robinson at Wade Park and Ansel Road were fired from the same Smith & Wesson .40 caliber pistol. Moreover, the evidence shows that the victim of the Wade Park and Ansel Road shooting lived at the house on Maud Avenue, and a reasonable trier of fact could conclude this commonality of victims connected Gilcrease to the crimes.

[*P62] Construing this evidence in a light most favorable to the state, we find the state presented sufficient evidence from which a reasonable factfinder could infer that Gilcrease was the shooter on May 14, 2017, and he knowingly discharged a .40 caliber firearm into two residences (Counts 1 and 3), one of which was the home in which Dominique lived, and discharged the firearm on or near prohibited premises (Counts 2 and 4).

*Gilcrease,* 2020 Ohio App. LEXIS 451 at *26-39 (Doc. No. 5-1, Ex. 9, ¶¶ 56-62).

Gilcrease argues that the state court's finding was "objectively unreasonable" because there was no evidence Gilcrease possessed the firearm at the time of the "house shootings" and there were no witnesses that placed Gilcrease at the shooting. Gilcrease testified that he did not possess a gun at the time of the "house shootings" on May 14, 2017, and that he bought his .40

caliber gun two weeks later on May 28, 2017.  (Doc. No. 5-5 at 154-55, 161, 164; Tr. 903-04, 910, 913) The trial court, however, did not find Gilcrease's testimony convincing on this point:

> Regarding the house shooting, counts 1 through 4 are the house shootings. The court has deliberated long and hard about this because the real evidence here was the casings. The only evidence that contradicted this was the defendant's statement. The defendant testified he was not in the area at the time, that he didn't own the gun. I weighed the circumstantial evidence that was provided by Ms. Alexander and Ms. Robinson and the scientific evidence, and weighed that against the defendant's testimony in these counts. The court does find that the state has met its burden on these counts.

Accordingly, the trial court found Gilcrease guilty on Counts 1 through 4. (Doc. No. 5-6 at 58-60, Tr. 1016-18)

The appellate court identified several facts in support of the trial court's verdict: (a) Gilcrease possessed and discharged a .40 caliber firearm on June 3, 2017, ("gas station shooting") and June 26, 2017 ("Wade Park shooting"); (b) officers recovered .40 caliber casings from the two June shootings as well as the May 14th "house shooting;" (c) Gilcrease's .40 caliber firearm was discharged and ultimately resulted in the death of Dominique Robinson; (c) the .40 caliber casings recovered from the  "house shootings" were found outside of Dominique Robinson's mother's home and the nearby home of Ms. Alexander shortly after each called the police to report that their homes were shot into; (d) a ballistics expert testified that the .40 caliber casings recovered from the "gas station shooting" and the "Wade Park" shooting were from the same weapon used in the May 14, 2017, "house shooting" incident. *Gilcrease,* 2020 Ohio App. LEXIS 451 at *26-39 (Doc. No. 5-1, Ex. 9, ¶¶ 56-62) The appellate court also found that because Dominique Robinson lived at the Maud Avenue house with his mother, "a reasonable trier of fact could conclude this commonality of victims connected Gilcrease to the crimes." *Id.* at ¶ 62.

Based on the above, the appellate court reasonably applied the *Jackson* standard. The *Jackson* standard is whether the fact finder made a rational decision to convict or acquit. *Herrera*

*v. Collins*, 506 U.S. 390, 402 (1993). In making this determination, a court does not reweigh the evidence or redetermine the credibility of the witnesses. *Matthews v. Abramajtys,* 319 F.3d 780, 788 (6th Cir. 2003). In addition, circumstantial evidence alone may be sufficient to support a conviction. *Newman v. Metrish*, 543 F.3d 793, 796 (6th Cir. 2008) (internal citation omitted). In considering a sufficiency claim, "circumstantial evidence is entitled to equal weight as direct evidence." *Durr v. Mitchell*, 487 F.3d 423, 449 (6th Cir. 2007).  The Supreme Court has stated that "*Jackson* leaves [fact finders] broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that [fact finders] 'draw reasonable inferences from basic facts to ultimate facts.' " *Coleman v. Johnson*, 566 U.S. 650, 655, 132 S. Ct. 2060, 2064, 182 L. Ed. 2d 978 (2012) quoting *Jackson*, 443 U.S. at 319. Gilcrease testified that he used his .40 caliber gun in the "gas station shooting" and the "Wade Park shooting" in June of 2017. A ballistics expert testified that the gun used in the June shootings was the same gun used in the "house shootings." Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could infer that Gilcrease purchased the gun at least a couple of weeks earlier than he stated and used the gun to shoot at Dominique Robinson's home the month prior to fatally shooting Dominique Robinson with the gun at Wade Park, especially in consideration of this "commonality of victims connected Gilcrease to the crimes." *Gilcrease*, 2020 Ohio App. LEXIS 451 at *30 (Doc. No. 5-1, Ex. 9, ¶¶ 61).

"[T]he only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 566 U.S. 650, 656, 132 S. Ct. 2060, 2065, 182 L. Ed. 2d 978 (2012) Though the evidence is circumstantial, it is entitled to the same weight as direct evidence and the court was permitted to rely on it in making its determination. The Ohio appellate court concluded that viewing the evidence in a light most

favorable to the prosecution, and according the benefit of all reasonable inferences to the

prosecution, a "a reasonable factfinder could infer that Gilcrease was the shooter on May 14,

2017, and he knowingly discharged a .40 caliber firearm into two residences (Counts 1 and 3),

one of which was the home in which Dominique lived, and discharged the firearm on or near

prohibited premises (Counts 2 and 4)." *Gilcrease*, 2020 Ohio App. LEXIS 451 at *26-39.

(Doc. No. 5-1, Ex. 9, ¶¶ 56-62). In light of the above authority and facts, the Court concludes

that this decision is neither contrary to, nor involves an unreasonable application of, clearly

established federal law. Furthermore, this decision was not based on an unreasonable

determination of the facts in light of the evidence presented. Accordingly, Gilcrease's Ground

Two raises no issue upon which habeas relief may be granted.

### IV.  Conclusion

For all the reasons set forth above, it is recommended that the Petition be **DENIED.**


Date: July 17, 2023                               *s/ Jonathan Greenberg*
                                                  Jonathan D. Greenberg
                                                  United States Magistrate Judge


### OBJECTIONS
**Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after being served with a copy of this document.
Failure to file objections within the specified time may forfeit the right to appeal the
District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**